GRIEVANCE COMMITTEE OF THE HARTFORD COUNTY BAR *vs.* EDWARD W. BRODER.

First Judicial District, Hartford, October Term, 1930.

WHEELER, C. J., MALTBIE, HAINES, HINMAN and BANKS, Js.

Argued October 14th—decided November 7th, 1930.

*Hugh M. Alcorn,* State's Attorney, and *Donald Gaffney,* with whom, on the brief, was *Harold E. Mitchell,* for the appellant (the complainant).

*Josiah H. Peck* and *Francis W. Cole,* with whom was *William D. Shew,* for the appellee (the respondent).

WHEELER, C. J. The complaint filed by the Grievance Committee of Hartford County Bar on January 6th, 1930, alleged that Edward W. Broder, an attorney, was on September 24th, 1929, upon his plea of guilty convicted of the crime of adultery with Lillian S. Hastings, involving his character, integrity, professional standing and conduct and sentenced to be imprisoned in jail for four months and prayed that such proceeding be taken thereon as the laws and rules of court direct. Upon the issuance of the rule to show cause the attorney admitted his guilt of the charge in the complaint. At the hearing upon this complaint the record of what transpired before the court on the trial of the adultery charge was laid in evidence. None of the facts as stated by counsel were in conflict so far as this record shows. It is made a part of the finding, the facts of which are as follows: Mr. Broder was admitted to the bar in 1908 and has since practiced law in Hartford, enjoying an excellent reputation and a large practice. His professional integrity during his practice has never been questioned and no complaint has been made or question raised as to his professional honesty, honor or conduct. He has been a prominent and honored figure in Hartford, twice elected to the State Senate and in 1926 was the candidate of one of the major parties for mayor of Hartford. At the time of the adultery as charged he was about fifty years of age and unmarried, while Mrs. Hastings was about thirty-one years of age and a woman of refinement having always enjoyed an excellent reputation. She had been married to Mr. Hastings just before he went abroad in service in the World War in which he achieved a very remarkable war record and for a number of years they lived happily together and she had borne him three children when she met the respondent. The acquaintance

rapidly ripened into a violent mutual infatuation which persisted to the time of the hearing on the complaint. The finding stated that after the arrest of Mr. Broder and Mrs. Hastings for adultery at the Highland Court Hotel in Hartford influences were speedily at work to suppress this matter and that the State's Attorney found it necessary, in the due administration of justice, to ask the Superior Court for the issuance of a bench warrant for the respondent and Mrs. Hastings. They were arrested on the bench warrant and released upon each giving a bond in the sum of $2500. On September 24th, 1929, each pleaded guilty to the information for adultery on June 5th, 1929, and the court found them guilty and sentenced each of them to four months in jail but suspended the execution of sentence against Mrs. Hastings for the period of one year under probation. From this date, June 5th, 1929, to September 24th, 1929, the date of judgment, the respondent and Mrs. Hastings have persisted in their association, not only in this State but elsewhere. The respondent, without complaint and without asking or receiving special favors, served the four months' term in jail less the allowance for good behavior and was released on January 4th, 1930. After his conviction, and as a consequence thereof, his name was stricken from the voting list of Hartford. Subsequent to the conviction Mr. Hastings obtained a divorce from Mrs. Hastings on the ground of adultery with the respondent and the custody of the three minor children of their marriage was awarded to him. Immediately upon his release from jail the respondent married Mrs. Hastings. His conduct since that time has been exemplary.

The court reached the conclusions (1) that the disbarment of an attorney is a matter within the sound discretion of the court and (2) in the exercise

of its discretion it found that the respondent is fit and qualified to practice law, that he should not be disbarred, and that the complaint should be dismissed.

The trial court was correct in its conclusion that the disposition of a disbarment proceeding was within the exercise of its sound discretion. That means a judicial discretion; the test is, has the court exercised a reasonable discretion, in other words, has it exercised its discretion so unreasonably as to constitute an abuse of discretion. *Hayward* v. *Plant,* 98 Conn. 374, 382, 119 Atl. 341.

The decision of a trial court suspending or displacing an attorney is reviewable in an appeal to this court by the respondent attorney or by the maker of the complaint if the court refuses to suspend or displace him. One of the grounds for the exercise of its discretion as stated by the trial court was "because it [the act of adultery] was unconnected in any way with the respondent's professional conduct." That is not the exclusive test. There is a common standard whether it be professional or nonprofessional, and that is, whether the conduct is so indicative of moral unfitness for a member of the profession as to justify displacement as well as exclusion from the bar.

The opinion of CHIEF JUSTICE PRENTICE in the case of *In re Peck,* 88 Conn. 447, 450, 451, 91 Atl. 274, states our rule in these terms: "As important as it is that an attorney be competent to deal with the oftentimes intricate matters which may be entrusted to him, it is infinitely more so that he be upright and trustworthy. Unfortunately it is not easy to limit membership in the profession to those who satisfy the standard test of fitness. But scant progress in that direction can be hoped for if, in the determination of the qualification of professional fitness, nonprofessional dishonor and dishonesty in whatsoever path of life

is to be ignored. Professional honesty and honor are not to be expected as the accompaniment of dishonesty and dishonor in other relations. So it is that we, in common with other courts, hold, as did Lord Mansfield more than a century ago, that misconduct, indicative of moral unfitness for the profession, whether it be professional or nonprofessional, justifies dismissal as well as exclusion from the bar. *In re Durant,* 80 Conn. 140, 147, 67 Atl. 497; *Fairfield County Bar* v. *Taylor,* 60 Conn. 11, 17, 22 Atl. 441."

The question for decision in this proceeding is this: Did the conduct of the respondent, from the time of his commission of the crime for which he was arrested to the date of his conviction upon his plea of guilty, so violate the standard of nonprofessional character and conduct which is required of the attorney by the courts, the profession of the law and the public as to have required the court to render its judgment disbarring him?

Specifically, the determination of whether the trial judge exercised his discretion unreasonably is dependent upon the conclusion that the conviction of the respondent for adultery is indicative of such moral unfitness as to justify his dismissal from the bar. The seriousness of the crime of adultery in the legislative mind is evidenced in the statutory penalty. "Any man and any married woman who shall commit adultery with each other shall be imprisoned not more than five years." General Statutes, § 6223. Our court holds a like view of the character of this crime. We say in *State* v. *Avery,* 7 Conn. 266, at page 270: "I have already shewn, that adultery is a very great crime, *once capital,* now punishable like most other felonies. . . . And an attempt to commit . . . such a crime, must be, at least, a high crime and misdemeanour; and we have already said, that a high crime and misde-

meanour is nearly allied and equal in guilt to felony (*State* v. *Knapp*, 6 Conn. Rep. 415)." See also *Fimara* v. *Garner*, 86 Conn. 434, 85 Atl. 670. In *Drazen* v. *New Haven Taxicab Co.*, 95 Conn. 500, 506, 508, 111 Atl. 861, we define infamous crimes to be those "whose commission involves an inherent baseness and which are in conflict with those moral attributes upon which the relations of life are based. . . . They are said to be those which involve moral turpitude. . . . It [the infamous crime] includes anything done contrary to justice, honesty, modesty, or good morals. . . . As we have seen, crimes whose punishment must be imprisonment in the State prison are regarded by us as necessarily infamous. And we hold that crimes whose penalty may be imprisonment in the State prison, will be held to be infamous when the nature of the crime involves moral turpitude . . . and the penalty may be six months or more."

We define this term again in *Kurtz* v. *Farrington*, 104 Conn. 257, at page 262, 132 Atl. 540: "Generally speaking . . . moral turpitude involves an act of inherent baseness in the private, social, or public duties which one owes to his fellowmen or to society, or to his country, her institutions and her government."

The injury to society, to the laws, to the court, to the family relation, to the wronged husband and to the children of tender years by this respondent's act of adultery makes of it an act of inherent baseness without alleviation or excuse. It was not the act of youth, or the act of sudden temptation, or of an irresponsible moment, but after this acquaintance began it rapidly ripened into a violent and mutual infatuation and persisted and continued for a period exceeding upward of three years preceding their arrest and conviction for the adultery. Adultery was conduct involving moral turpitude and under our law an infamous crime since

the penalty might be imprisonment in the State prison. It was indicative of that "moral unfitness for the profession" of which CHIEF JUSTICE PRENTICE wrote in *In re Peck, supra.*

There are other circumstances present which should have had a controlling effect upon the exercise of the discretion of the trial court in a proceeding of this character. The respondent was a mature and experienced man of about fifty; he knew the law and his duty to society. Yet the mutual violent infatuation was continued by this defendant with the wife of an honorable man for nearly three years until in defiance of moral laws and social observance they were apprehended carrying on their illegal association in a hotel in the business center of Hartford. So far had they gone in this course as to be careless of social observance or even decency. After their exposure and arrest down to the very day of their trial, in and out of the State, they persisted in their unlawful association in open defiance of the statute under which they were convicted. Not a syllable of penitence from the respondent appears in this record for the profession which he has dishonored, or the law which he has outraged, or the social customs and institutions of his country which he has treated with contumely. He has, as the trial judge said in sentencing him, "deliberately chosen to put his own ideas of law above what you might fairly call the laws of God and of man." All that has been said in behalf of the respondent is that he was the victim of an uncontrollable violent infatuation and has had a fine career at the bar and a fine position among his fellowmen. These cannot atone for his guilt of this crime, for his defiance of the law, and for the home he has dismembered and the family ties he has broken.

As a consequence of his conviction for an infamous crime the respondent's name has been stricken from the voting list in the city of Hartford. In determining the moral fitness of the respondent to practice law the court should also have taken into consideration the constitutional and statutory privileges as an elector which he has lost through his conviction of this crime. Every applicant for admission to the bar must satisfy the bar examining committee that he is a person of good moral character. Practice Book, p. 237, § 4. The attorney from another State must also provide a certificate of good moral character before he can be admitted to the bar. Practice Book, p. 240, § 8 (a) and (b). One who has committed adultery and upon his plea of guilty been convicted of this infamous crime, has upon his conviction forfeited his rights as an elector, and during a period of fourteen weeks between his arrest and conviction and while at large on bail continued, within and without the State, his adulterous association could not be regarded as a person of good moral character, or permitted to take the bar examination by the examining committee. Neither would an attorney from another State be admitted to our bar on certificate with such a record. Conduct which would deprive these applicants of the right to become members of our bar because of their lack of moral character should for the same reason deprive the experienced practitioner of his right to continue as a member of the bar. "A lawyer without good character is not only a reproach to his profession, but he brings into public distrust, and is a very menace to, the administration of justice itself. All courts have, as an incident of the power to admit attorneys to their bar, the power to disbar them for such conduct as shows they are no longer worthy of confidence. It is not necessary that the misconduct should be such as would

render him liable to criminal prosecution. If it shows that he is unfit to discharge the duties of his office, is unworthy of confidence even though the conduct is outside of his professional dealings, it is sufficient. If he is not honest; if he is not moral; if he is not of good demeanor, he may be disbarred, and should be. His office is a very badge of respectability; a patent of trustworthiness, derived from his position on the court's roll of counsel. He ought not to be suffered to pass for what he is not." *Underwood* v. *Commonwealth*, 32 Ky. Law R. 32, 33, 105 S. W. 151. The trial court exercised its discretion in reliance quite largely upon the idea that only conduct directly touching the pursuit of the law would furnish cause for disbarment, and that neither the attorney's oath nor the Code of Ethics "touch conduct outside the profession at all." This we conceive to have been a misconception of the law, the oath and the Code of Ethics.

The public notoriety of this case has made doubly imperative our duty to make it entirely clear that the standards of conduct, nonprofessional as well as professional, of the members of the profession of the law in Connecticut have not changed, and that those standards will be applied under our rules of law, in the exercise of a reasonable discretion, however high a place in the profession the attorney who violates them may hold.

There is error, the judgment is reversed and the Superior Court directed to render its judgment that the respondent be indefinitely disbarred from hereafter exercising his rights and privileges as an attorney and from practicing as an attorney, in this State.

In this opinion the other judges concurred.