STATE OF NORTH CAROLINA v. CHARLIE JOHNSON MANN

No. 755PA85

(Filed 2 July 1986)

1. **Criminal Law § 4— solicitation to commit common law robbery—infamous crime**

    Solicitation to commit common law robbery is an infamous crime within the meaning of N.C.G.S. § 14-3; where a defendant has counseled, enticed, or induced another to commit as degrading an offense as theft from the person or presence of a victim by force or by putting him in fear, he has committed an act of depravity and a crime involving moral turpitude and has demonstrated that he has a mind fatally bent on mischief and a heart devoid of social duties.

2. **Criminal Law § 122.2— failure to reach verdicts—additional instructions—verdict not coerced**

    The trial judge did not coerce a verdict in a prosecution for solicitation of common law robbery and conspiracy to commit robbery where the trial judge instructed the jury in accordance with N.C.G.S. § 15A-1235(b) when first informed that the jury had reached unanimous verdicts on all but one charge;

defendant concedes that the judge's instructions complied with the statute; the trial judge did not abuse its discretion or coerce a verdict by inquiring into the jury's division; consideration of all the circumstances of the case reveals no reasonable ground to believe that the jury was misled; and there is not a reasonable probability that the trial judge's actions or statements changed the result of the trial.

3. **Criminal Law § 138.29— nonstatutory aggravating factor—set a course of criminal conduct in motion which resulted in other crimes—no error**

The trial judge did not err when sentencing defendant for soliciting common law robbery by finding as a non-statutory aggravating factor that defendant set a course of criminal conduct in motion by his own actions which ultimately resulted in other crimes where the evidence was sufficient to establish by a preponderance of the evidence that defendant formed the original idea to rob the victim, that he masterminded the plan, and that he counselled and enticed others to rob the victim.

Justice BILLINGS concurring.

ON the State of North Carolina's petition for discretionary review of the decision of the Court of Appeals, 77 N.C. App. 654, 335 S.E. 2d 772 (1985), which found no error in the trial of defendant before *Hobgood, J.*, at the 30 April 1984 session of Superior Court, ALAMANCE County, but remanded the case for resentencing. Heard in the Supreme Court 17 April 1986.

*Lacy H. Thornburg, Attorney General, by Evelyn M. Coman, Assistant Attorney General, for the state.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by David W. Dorey, Assistant Appellate Defender, for defendant.*

MARTIN, Justice.

The primary issue raised on this appeal is one of first impression: whether solicitation to commit common law robbery is an infamous crime. We hold that it is and therefore reverse the decision of the Court of Appeals as to this issue.

At trial, the state's evidence showed that Penelope Dawkins, the fiancee of Richard Lockamy, lived with Lockamy in a Mebane trailer park which was managed by codefendant Keith Barts. In September 1983, while visiting Lockamy's sister, Penelope and Lockamy met defendant, Charlie Mann. Thereafter, Penelope and Lockamy would, about two to three times a week, help Mann with his sawmill, straighten up his yard, and clean his house. At some

point, Mann told Lockamy that he knew Lockamy had a criminal record and that Lockamy and Penelope needed money. Penelope testified that Mann told them that he knew an elderly man in Snow Camp who carried large sums of money in his bib overalls and that "[h]e would be an easy man to rob. It would take two men to rob the man. The best thing to do would be to go to a shed and wait for him to come home and after he got out of his truck, rob him from there." Lockamy told Mann he would think about it. Penelope testified that thereafter the subject came up three or four times a week. Mann would ask Lockamy if he had thought about it, and Lockamy would respond that he had, but that "he hadn't done anything about it. And, Mr. Mann kept telling him that if he didn't do it himself, . . . that he would find somebody else to do it or he would do it." About a week later, Mann picked up Lockamy at his trailer one morning in order to show him where the intended victim, Richard Braxton, lived.

Sometime later, it was discovered that Mann knew Keith Barts. About a week later, Barts told Penelope and Lockamy that he had known Mann for several years and that Mann "had set him up on three jobs," and he told Penelope and Lockamy "of the jobs he pulled off." Barts also said "[t]hat the set-up, the job in the country sounded like a good lick." Then, one Monday night approximately two weeks before Braxton was killed, Lockamy, Barts, and John David "Fireball" Holmes rode to Braxton's home planning to rob the old man. Their plan was thwarted when they saw Braxton's son or grandson was with him.

On 20 November 1983, Barts arrived at Penelope's trailer. He told Lockamy, "I did that job last night. . . . The job in the country, but I think I killed the man." Barts went on to say that he had gone to the old man's house, hidden in the shed, and waited for him to come home. When the old man arrived home, Barts jumped him and began beating him. Barts said, "I beat the old . . . until I got plumb tired of beating him. . . . I beat him until he quit moving. The whole time the old man screamed, 'Oh, God, you're gonna kill me.'" Barts said that the old man was strong and that when he "bucked" on him and hit Barts in the back with something, Barts got mad. Barts then said that the only way to know if he had actually killed the man would be to read about it in the newspaper.

In exchange for his testimony for the state, as well as for his guilty pleas to conspiracy to commit robbery and armed robbery, all other charges against Richard Lockamy were dismissed. Lockamy substantially corroborated Penelope's testimony, saying that Mann had told him he probably could tie Braxton up with a rope and wouldn't have to use any weapons to get the money. Mann also told Lockamy what he considered to be "the best way to do the job." Lockamy testified that Mann "was very persistent about someone doing the job." Mann was "interested in some of the merchandise out of [Braxton's] home or either a thousand dollars." Mann said Braxton often carried with him $10,000 to $15,000 at a time. Mann also told Lockamy he had previously set up a burglary job for Keith Barts, who went on to actually commit that burglary. After the robbery and killing of Braxton, Barts told Lockamy that he had broken into Braxton's house "and messed it up quite a bit" and that he had also broken into the tool shed. Barts admitted he'd beat Braxton with a hammer and "some type of tool."

"Fireball" Holmes testified that on 19 November 1983, he drove Earl and Keith Barts to Braxton's house, arriving there at about 8:00 p.m. When they left the car, Keith had a baseball bat and a crowbar, and Earl had Holmes' .25-caliber automatic pistol and a rubber hubcap hammer. Holmes drove the car to a bridge some distance away and waited. About thirty minutes later, Holmes drove into Braxton's driveway and encountered Earl, who was carrying the baseball bat, a .22-caliber revolver which they had found in Braxton's house, and some brass knuckles. Braxton had not yet come home, so Holmes returned in the car to the bridge. About one and a half to two hours later, Keith and Earl came barrelling down the road in Braxton's pickup truck. Keith said they had had to beat the old man. After arriving at Earl's trailer, the three men split up the money, each taking approximately $1,000.

Written statements given by Keith Barts, Penelope Dawkins, and Richard Lockamy to SBI agent Terry Johnson, substantially corroborating the trial testimony of Dawkins, Lockamy, and Holmes, were read into evidence. However, Keith's statement indicated that Earl Barts, not he, had killed Mr. Braxton.

The assistant chief medical examiner testified that he performed an autopsy on the body of seventy-four-year-old Richard Braxton. Dr. Anthony testified that Braxton had at least six large open cuts on his left forehead which all ran together; both eyes were blackened; there were bruises on his face and chest; defensive wounds were present on his right hand; numerous other small cuts and abrasions were present, and bruises on the body "were so numerous we didn't actually count or quantitate them." Dr. Anthony said that the blows to the outside of the scalp broke skull bones, fragments of which had been driven into the brain, and in his opinion, Braxton died as a result of blunt trauma to the head. Dr. Anthony also testified that death was not instantaneous and that Braxton probably lived "for a period of time" after the blows were struck.

Defendant took the stand at trial and denied ever having asked either Penelope Dawkins or Richard Lockamy to rob Mr. Braxton. He said that he had known Richard Braxton all his life, that Braxton was his friend, and that Braxton's name had been mentioned in conversations with Lockamy and Penelope only because the couple desperately needed money and Lockamy had asked Mann's sister about the possibility of his doing some painting for Mr. Braxton.

Defendant offered the testimony of several witnesses who testified as to his good character. He also offered the testimony of Hasan Abdus Sabr, one of Lockamy's former cellmates, to the effect that Lockamy and Penelope, not defendant, had originated the plan to rob Richard Braxton and that Lockamy had told him that Charlie Mann did not know anything about robbing Braxton. Sabr later shared a cell with defendant for a day and a half, but said he had no conversation with Mann about what Lockamy had said.

The jury returned verdicts of guilty of soliciting Richard Lockamy to commit common law robbery of Richard Braxton, not guilty of solicitation of Penelope Dawkins to commit common law robbery, not guilty of conspiracy to commit robbery with a dangerous weapon, and not guilty of feloniously conspiring with Richard Lockamy to commit robbery with a dangerous weapon or common law robbery of Richard Braxton. Defendant was sen-

tenced to imprisonment for seven years for conviction of a Class H felony under N.C.G.S. § 14-3(b).

Defendant appealed to the Court of Appeals, which found no error in defendant's trial but remanded the case for resentencing of defendant as a misdemeanant. We granted the State of North Carolina's petition for discretionary review.

## I.

[1] It is well established that solicitation of another to commit a felony is a crime in North Carolina. *State v. Furr*, 292 N.C. 711, 235 S.E. 2d 193, *cert. denied*, 434 U.S. 924 (1977); *State v. Hampton*, 210 N.C. 283, 186 S.E. 251 (1936). This is true even though the solicitation is of no effect and the crime solicited is never committed. *Id.* It has been recognized at common law since at least *Rex v. Higgins*, 2 East 5, 102 Eng. Rep. 269 (1801) (solicitation to commit sodomy). It is an indictable offense under the common law of North Carolina. N.C.G.S. § 4-1 (1981). There is no question that common law robbery is a felony, *State v. Smith*, 305 N.C. 691, 292 S.E. 2d 264, *cert. denied*, 459 U.S. 1056 (1982); *State v. Black*, 286 N.C. 191, 209 S.E. 2d 458 (1974); *State v. Norris*, 264 N.C. 470, 141 S.E. 2d 869 (1965); nor is there any doubt that common law robbery itself is an infamous crime, *State v. McNeely*, 244 N.C. 737, 94 S.E. 2d 853 (1956); *Arnold v. United States*, 94 F. 2d 499, 506 (10th Cir. 1938); *Stephens v. Toomey*, 51 Cal. 2d 864, 338 P. 2d 182 (1959); *Cousins v. State*, 230 Md. 2, 185 A. 2d 488 (1962), as is an attempt to commit the felony of common law robbery, *State v. McNeely*, 244 N.C. 737, 94 S.E. 2d 853; *State v. Best*, 11 N.C. App. 286, 181 S.E. 2d 138, *cert. denied*, 279 N.C. 350 (1971). In order to determine whether defendant in this case is to be punished as a misdemeanant or as a felon, we must now decide whether solicitation of another to commit common law robbery is an infamous crime within the meaning of N.C.G.S. § 14-3.[1]

N.C.G.S. § 14-3, entitled "Punishment of misdemeanors, infamous offenses, offenses committed in secrecy and malice or with deceit and intent to defraud," provides, in pertinent part:

(b) If a misdemeanor offense as to which no specific punishment is prescribed be infamous, done in secrecy and

---

1. Defendant has not made a challenge to the constitutionality of N.C.G.S. § 14-3; therefore, we decline to address it.

malice, or with deceit and intent to defraud, the offender shall, except where the offense is a conspiracy to commit a misdemeanor, be guilty of a Class H felony.

N.C.G.S. § 14-3(b) (1981).

N.C.G.S. § 14-3 has remained basically unchanged since 1927. This Court held, in determining that an attempt to commit burglary was punishable under the statute, that if the crime was "infamous," or is one "done in secrecy and malice," or is committed "with deceit and intent to defraud," falling into any one of these categories, it is a felony under N.C.G.S. § 14-3 and punishable as prescribed therein. *State v. Surles*, 230 N.C. 272, 52 S.E. 2d 880 (1949). Thus, if solicitation to commit the crime of common law robbery falls into either of the three categories set out in N.C.G.S. § 14-3, it is punishable under it.

A crime is "infamous" within the meaning of the statute if it is an act of depravity, involves moral turpitude, and reveals a heart devoid of social duties and a mind fatally bent on mischief, *Surles*, 230 N.C. at 277, 52 S.E. 2d at 883. Other courts, using a similar test, look to the crime to determine whether it "shows such depravity in the perpetrator . . . as to create a violent presumption against his truthfulness under oath." *King v. State*, 17 Fla. 183, 185-86 (1879); *see Sylvester v. State*, 71 Ala. 17 (1881) (citing 1 Bishop on Criminal Law § 974 (1923) ); *Smith v. State*, 129 Ala. 89, 29 So. 699 (1900). As the court stated in *Grievance Committee v. Broder*, 112 Conn. 269, 275, 152 A. 292, 294 (1930):

> In *Drazen v. New Haven Taxicab Co.*, 95 Conn. 500, 506, 508, 111 Atl. 861, we define infamous crimes to be those "whose commission involves an inherent baseness and which are in conflict with those moral attributes upon which the relations of life are based. . . . They are said to be those which involve moral turpitude. . . . It [the infamous crime] includes anything done contrary to justice, honest, modesty, or good morals. . . .
>
> We define this term again in *Kurtz v. Farrington*, 104 Conn. 257, at page 262, 132 Atl. 540: "Generally speaking . . . moral turpitude involves an act of inherent baseness in the private, social, or public duties which one owes to his fellowmen or to society, or to his country, her institutions and her government."

Which offenses are considered infamous are affected by changes in public opinion from one age to another, *Mackin v. United States*, 117 U.S. 348, 29 L.Ed. 909 (1886); *Ex parte Wilson*, 114 U.S. 417, 29 L.Ed. 89 (1885); *State v. Surles*, 230 N.C. 272, 52 S.E. 2d 880, and the totality of circumstances must be examined in each case before a determination can be made that a specific crime is "infamous." *Accord State ex rel. Wier v. Peterson*, 369 A. 2d 1076, 1079 (Del. 1976). Further, "[i]n determining whether an offense is 'infamous,' state courts exercise independent judgment and are not bound by decisions of federal courts as to nature of crimes against federal government." *United States v. Carrollo*, 30 F. Supp. 3, 6 (D. Mo. 1939).

In determining whether the offense for which defendant was convicted in this case is infamous, we must, then, look to the nature of the offense being solicited. Our courts in prior cases have followed this analysis and concluded that solicitation to murder is an infamous crime, *State v. Furr*, 292 N.C. 711, 235 S.E. 2d 193; *see United States v. MacCloskey*, 682 F. 2d 468 (4th Cir. 1982), and that solicitation to commit perjury is an infamous offense, *State v. Huff*, 56 N.C. App. 721, 289 S.E. 2d 604, *disc. rev. denied*, 306 N.C. 389 (1982). The Court of Appeals has held, at the other end of the spectrum, that solicitation to commit crime against nature is not infamous. *State v. Tyner*, 50 N.C. App. 206, 272 S.E. 2d 626 (1980), *disc. rev. denied*, 302 N.C. 633 (1981). Solicitation to commit common law robbery lies somewhere between these opposite poles.

Solicitation involves the asking, enticing, inducing, or counselling of another to commit a crime. *State v. Furr*, 292 N.C. 711, 235 S.E. 2d 193. The solicitor conceives the criminal idea and furthers its commission via another person by suggesting to, inducing, or manipulating that person. As noted by Wechsler, Jones, and Korn in *The Treatment of Inchoate Crimes in the Model Penal Code of the American Law Institute: Attempt, Solicitation and Conspiracy*, 61 Colum. L. Rev. 571, 621-22 (1961), "the solicitor, working his will through one or more agents, manifests an approach to crime more intelligent and masterful than the efforts of his hireling," and a solicitation, "an attempt to conspire," may well be more dangerous than an attempt. Indeed, a solicitor may be more dangerous than a conspirator; a conspirator may merely passively agree to a criminal scheme, while the solicitor

plans, schemes, suggests, encourages, and incites the solicitation. Further, the solicitor is morally more culpable than a conspirator; he keeps himself from being at risk, hiding behind the actor, as occurred in this case.

Common law robbery, the solicitation of which defendant here was convicted, is the felonious taking of money or goods of any value from the person of another, or in his presence, against his will, by violence or putting him in fear. *State v. Black*, 286 N.C. 191, 209 S.E. 2d 458 (1974); *State v. Norris*, 264 N.C. 470, 141 S.E. 2d 869 (1965); *State v. Stewart*, 255 N.C. 571, 122 S.E. 2d 355 (1961). It is a crime against the person, effectuated by violence or intimidation. *State v. Rivens*, 299 N.C. 385, 261 S.E. 2d 867 (1980); *State v. Smith*, 268 N.C. 167, 150 S.E. 2d 194 (1966). Where a defendant has counselled, enticed, or induced another to commit as degrading an offense as theft from the person or presence of a victim by force or violence by putting him in fear, he has committed an act of depravity and a crime involving moral turpitude and has demonstrated that he has a mind fatally bent on mischief and a heart devoid of social duties. It is an infamous crime within the meaning of N.C.G.S. § 14-3 and defendant should be subject to punishment as a felon instead of as a misdemeanant.

We therefore hold that solicitation to commit common law robbery is an infamous crime within the meaning of N.C.G.S. § 14-3. Our extensive research of case and statutory law throughout the nation has revealed no result to the contrary.

II.

[2] Defendant next assigns as error certain of the trial court's actions and statements to the jury during deliberations, alleging that the trial court coerced a verdict in defendant's case.

Defendant's trial lasted twenty-one days; the trial transcript totals 3,236 pages. On 21 May 1984, the trial judge gave his charge to the jury and told the jurors:

> I instruct you that a verdict is not a verdict until all twelve jurors agree unanimously as to what your decision shall be. You may not render a verdict by majority vote. You will have a duty to consult with one another and to deliberate with a view to reaching an agreement if it can be done without violence to individual judgment.

Each of you must decide the cases for yourselves, but only after an impartial consideration of the evidence with your fellow jurors. In the course of deliberations, each of you should not hesitate to re-examine your own views and change your opinion if it is erroneous, but none of you should surrender your honest convictions as to the weight or effect of the evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

The jury then retired to the jury room but not to deliberate. After hearing arguments of counsel, the trial judge called the jury back in, gave it further instructions, and sent the jurors to lunch at 12:30 p.m. At 2:00 p.m., court reconvened and the trial judge sent the jury to the jury room at 2:05 to begin deliberations. At 2:30, the jury sent a request for additional instructions as to the elements of each charge and "the steps necessary for conviction of each charge." The judge so instructed, the jury again retired at 2:55, and defendant renewed his objection to the charge of felonious conspiracy to commit common law robbery. The jury deliberated until 5:02 p.m., and the court recessed for the evening. At 9:35 a.m. on 22 May, the jury resumed deliberations. Court went into recess at 5:31 p.m., at which time the jurors had not reached a verdict as to all charges. On 23 May, the jury continued its deliberations, beginning at 9:35 a.m. At 10:38 a.m., the jury told the trial court it had reached a unanimous verdict on all but the charge of soliciting Richard Lockamy to commit robbery, and the trial judge thereupon instructed the jury:

With respect to that case, your foreman informs me that you have so far been unable to agree upon a verdict. The Court wants to emphasize the fact that it is your duty to do whatever you can to reach a verdict. You should reason the matter over together as reasonable men and women and to reconcile your difference if you can, without the surrender of conscientious convictions, but no juror should surrender his or her conscientious conviction as to the weight or effect of the evidence, solely because of the opinion of his fellow juror, or for the mere purpose of returning a verdict.

A verdict is not a verdict until all twelve jurors agree unanimously as to what your decision shall be. You may not render a verdict by majority vote. You all have a duty to con-

sult with one another and to deliberate with a duty to reaching an agreement if it can be done without violence to individual judgment.

Each of you must decide the case for yourselves, but only after an impartial consideration of the evidence with your fellow jurors. In the course of deliberations, each of you should not hesitate to re-examine your own view and change your opinion if it is erroneous, but none of you should surrender your honest convictions to the weight or effect of the evidence, solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

At this time I'll let you resume your deliberations and see if you can reach a verdict in that case that the foreman has mentioned to me.

At 11:16, the jury asked the trial judge to again "define the elements needed with respect to solicitation and the definition of intent with respect to that file number." The trial judge complied with its request. The jury resumed its deliberations at 11:40 a.m. At 12:35 p.m., the jury returned to the courtroom before its lunch recess. At that time, it sent a note to the trial judge saying: "The jury is unable to reach a unanimous verdict with respect to file number 84-CRS-4858 only." The trial judge thereupon asked, "Without telling me how you are voting in that file number, can you tell me the numerical split for the jury?" The jury foreman replied that the last vote was eight-to-four, and the trial judge sent the jury to lunch. When the jurors returned at 2:00, the trial judge asked them to go back into the jury room "and discuss the evidence in this case once again and deliberate and to see if you can reach a verdict as to this particular case." The jury went to resume deliberations at 2:03 and returned at 3:00 with a verdict. The jury submitted the ten verdict sheets, and each and every juror raised his or her right hand to confirm agreement with the trial judge's reiteration of the verdicts in each case. Following this procedure, the defense attorney asked the trial judge to poll the jury on the solicitation of Lockamy to commit robbery charge, and the jury was polled. Each juror affirmed his or her assent to the guilty verdict.

Defendant contends that the trial court coerced the jury by, among other things, requesting that it resume its deliberations at

2:00 on 23 May without once more instructing the jurors at the time of his request that none of them had to give up their convictions in reaching a verdict. "[T]he actions and statements of the trial court, when viewed within the totality of the circumstances," defendant alleges, "were such that a reasonable juror could not help but feel required to surrender his individual convictions in order to reach a unanimous verdict." Defendant argues that the trial court's inquiring as to the numerical split and sending the jurors back for further deliberations without reinstructing them not to abandon their convictions "might easily have been construed as a refusal, on the court's part, to accept anything less then [sic] a unanimous verdict." This, defendant maintains, violated the well-settled prohibition against a trial judge's coercing a jury into reaching a verdict. *State v. Lipfird*, 302 N.C. 391, 276 S.E. 2d 161 (1981); *State v. Alston*, 294 N.C. 577, 243 S.E. 2d 354 (1978); *State v. Roberts*, 270 N.C. 449, 154 S.E. 2d 536 (1967). We disagree.

When the jury first informed the court it had reached unanimous verdicts on all but one charge but had not reached a verdict in case number 84-CVS-4858, the trial court instructed the jury in accordance with N.C.G.S. § 15A-1235(b). N.C.G.S. § 15A-1235(b) provides:

> (b) Before the jury retires for deliberation, the judge may give an instruction which informs the jury that:
>
> > (1) Jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;
> >
> > (2) Each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors;
> >
> > (3) In the course of deliberations, a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous; and
> >
> > (4) No juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict.

Defendant concedes that the trial judge's instructions complied with the statute. Further, the trial court did not coerce a verdict by his inquiry as to the jury's division. The making of such inquiry lies within the sound discretion of the trial judge. *State v. Easterling*, 300 N.C. 594, 268 S.E. 2d 800 (1980); *State v. Jeffries*, 57 N.C. App. 416, 291 S.E. 2d 859, *cert. denied & appeal dismissed*, 306 N.C. 561 (1982); *see generally* Annot. *Dissenting Jurors — Instructions*, 97 A.L.R. 3d 96 (1980 & Supp. 1985). We find no abuse of that discretion. Our consideration of all the circumstances in this case surrounding the trial judge's instructions reveals no reasonable ground to believe that the jury was misled, and we do not perceive a reasonable probability that the trial judge's actions or statements changed the result of the trial. *State v. Alston*, 294 N.C. 577, 243 S.E. 2d 354. The trial court's charge to the jury on the matter of further deliberations was proper under the circumstances and without prejudice to defendant. Accordingly, this assignment of error is overruled.

[3]  Last, defendant assigns as error the trial court's finding as a factor in aggravation that defendant set a course of criminal conduct in motion by his own actions which ultimately resulted in other crimes.

At the close of all the evidence, the trial court dismissed the charges against defendant of murder in the first degree, burglary in the second degree, felonious breaking or entering, and robbery with a dangerous weapon. The jury returned verdicts of not guilty of the solicitation of Penelope Dawkins to commit common law robbery and of conspiracy to commit armed robbery. At defendant's sentencing hearing on the convictions of soliciting Lockamy to commit common law robbery, the trial judge found as a nonstatutory factor in aggravation of punishment that

> [t]he defendant set a course of criminal conduct in motion by his own actions which ultimately resulted in the robbery with a dangerous weapon and death of Richard Braxton and the second degree burglary of his dwelling, the felonious breaking or entering of his storage shed, the felonious larceny of his truck and the taking of a large amount of cash money from his person.

Defendant contends that because all of the offenses for which this factor purports to hold defendant responsible were dismissed or

resulted in acquittals, the factor is not reasonably related to sentencing under N.C.G.S. § 15A-1340. *State v. Medlin*, 62 N.C. App. 251, 302 S.E. 2d 483 (1983). He further argues that the finding of the factor was not supported by a preponderance of the evidence and violated the prohibition of N.C.G.S. § 15A-1340.4 (a)(1)(o). This statute proscribes as an aggravating factor the use of convictions for offenses joinable under Chapter 15A of the General Statutes of North Carolina with the crime for which a defendant is being sentenced. *State v. Lattimore*, 310 N.C. 295, 311 S.E. 2d 876 (1984).

A preponderance of the evidence is sufficient to prove an aggravating factor supporting a sentence in excess of the presumptive term. *State v. Ahearn*, 307 N.C. 584, 300 S.E. 2d 689 (1983); *State v. Robinson*, 73 N.C. App. 238, 326 S.E. 2d 86 (1985). Here, both Richard Lockamy and Penelope Dawkins testified that defendant formed the original idea to rob Richard Braxton, that he masterminded the plan, and that he counselled and enticed others to rob Mr. Braxton. Defendant thereby set in motion a course of criminal conduct that resulted in the crimes of murder, burglary in the second degree, felonious breaking or entering, and felonious larceny of a truck. This evidence was properly considered by the trial court during sentencing and was sufficient to establish by a preponderance of the evidence that defendant set this course of criminal conduct into motion by his own actions.

*Lattimore* is inapposite because that case involved the aggravation of the defendant's sentence based on a joinable offense for which the defendant had been *convicted.* Here, the court properly considered evidence in support of an aggravating circumstance which supported crimes of which defendant was charged and tried but which were dismissed. *State v. Abee*, 308 N.C. 379, 302 S.E. 2d 230 (1983). This assignment of error is overruled.

We find no error in defendant's trial or sentence. Accordingly, that part of the decision of the Court of Appeals finding no error in the trial of this case is affirmed; the order of remand to the superior court for resentencing of defendant as a misdemeanant is reversed.

Affirmed in part; reversed in part.

State v. Mann

Justice BILLINGS concurring.

Because of a long line of cases since this Court's decision in *State v. Surles*, 230 N.C. 272, 52 S.E. 2d 880 (1949) and the failure of the General Assembly to amend or repeal N.C.G.S. § 14-3, I feel compelled to concur in the Court's interpretation of the term "infamous crime" as used in N.C.G.S. § 14-3. However, for all of the reasons expressed by Justice Ervin in his dissenting opinion in *Surles*, I believe that the interpretation given to that term by the majority in *Surles* was contrary to the meaning of infamous crime at the time of the original enactment of the statute and that the common law definition was intended. At common law, infamous crimes constituted a fairly clearly-identified group of offenses.

As construed, however, the statute allows the Court to determine what general misdemeanors are to be treated as felonies based upon our perception of the degree of depravity involved in the commission of the offense. It seems to me that this makes it impossible for anyone to anticipate the scope of application of the statute. As the result of today's decision, we know that solicitation to murder is an infamous crime but that solicitation to commit crime against nature may be "at the other end of the spectrum" 317 N.C. 164, 171, 345 S.E. 2d 365, 369, and not infamous. Apparently, anything in between is potentially covered by the statute.

Justice Martin notes in the Court's opinion that the defendant has not made a challenge to the constitutionality of N.C.G.S. § 14-3, and, appropriately, the Court has not addressed that issue. I write separately not so much to suggest the unconstitutional vagueness of the statute as to suggest to the General Assembly that some legislative limitation on the scope of the statute as construed in *Surles* would seem appropriate.