STATE OF NORTH CAROLINA v. LAUREN ELIZABETH CROWE

No. COA07-428

(Filed 19 February 2008)

### 1. Homicide— solicitation—evidence not sufficient

The trial court erred by denying defendant's motion to dismiss a charge of solicitation to commit murder. The State presented no evidence that defendant counseled, enticed, or induced another to murder her mother.

### 2. Homicide— conspiracy—evidence sufficient

The trial court did not err by denying defendant's motion to dismiss a charge of conspiracy to murder her mother for insufficient evidence.

Appeal by defendant from judgments entered 12 May 2006 by Judge J. Marlene Hyatt in Cherokee County Superior Court. Heard in the Court of Appeals 26 November 2007.

*Roy Cooper, Attorney General, by Christopher G. Browning, Jr., Solicitor General, for the State.*

*Crumpler Freedman Parker & Witt, by Vincent F. Rabil, for defendant-appellant.*

MARTIN, Chief Judge.

Defendant Lauren Elizabeth Crowe was indicted for the first degree murder of her mother, Janet Evangeline Crowe Mundy, for soliciting Christopher Albert Tarantino to commit the felony of first degree murder, and for conspiring with Tarantino to commit first degree murder. She entered pleas of not guilty and was tried noncapitally. A jury found defendant not guilty of first degree murder and guilty of solicitation to commit first degree murder and conspiracy to commit first degree murder. Defendant was sentenced to consecutive sentences of 72 to 96 months for solicitation to commit first degree murder and 156 to 197 months for conspiracy to commit first degree murder. Defendant gave notice of appeal.

As relevant to the issues properly before this Court, evidence presented at defendant's trial tended to show that in the early morning hours of 10 July 2004, defendant's mother was fatally shot and stabbed in her home. She suffered four gunshot wounds to the legs,

abdomen, liver, and lung, and multiple stab wounds to the neck, back, shoulder, and hand. The victim was found partially clothed lying on top of some bedding in the doorway between the kitchen and her bedroom with blood pooling around her. The glass panel closest to the doorknob on the front door was broken, glass particles were found inside the home, and the house looked as though it had been "ransacked." Upon entry into the home, the investigative personnel on the scene smelled a "strong odor" which "seemed to be practically everywhere." The source of the odor was later determined to be vinegar. A bottle of vinegar was found on the floor next to the victim's body. The scent of vinegar was also found on the lower portion of the size 2 blue jeans found on the floor of defendant's bedroom.

Defendant called 911 at 5:01 a.m. to report the murder of her mother. Defendant told the 911 dispatcher that she was "in bed asleep and heard noises, heard a car drive by, heard a window break" and "came downstairs and found her mother on the floor and she was dead." When authorities arrived at the scene, the then-sixteen-year-old defendant was found "sitting on the front porch still holding the phone." When asked where her mother was, defendant sat silently and then motioned with her head toward the house saying, "In there."

At the scene, defendant told investigators that when she heard the gunshots, she hid in the bedroom closet. She said she saw a tall, skinny black male get into a dark vehicle with a Tennessee license plate and an orange sticker on the back. Defendant later told investigators that Junior Mundy, defendant's stepfather, murdered her mother. In this second version of events, defendant said that Junior Mundy fought with her mother earlier in the evening and said she heard him tell her mother, "This is your last chance to choose me or [defendant]." Defendant said she heard him slap her mother and heard her mother scream, "No, no," and then heard gunshots. Defendant said she ran downstairs and saw Junior Mundy "throwing things everywhere." She said he told her that, "unless she wanted things to happen to her," she should help him clean up the blood. Defendant said Junior Mundy broke the window by the doorknob with a blue flashlight and took the vinegar-soaked, bloodstained rag defendant was using to clean the floor and rubbed it all over her shirt. Defendant said he changed his clothes and left with the bloody rag.

Defendant then changed her story again and told investigators that Tarantino, her former boyfriend, arrived at her mother's home at

4:15 a.m. to murder her mother. During her interview at the Cherokee County Sheriff's Office, defendant reportedly said that Tarantino arrived at her home with a gun and, when she met him outside, "she knew what was going to happen." Defendant said that Tarantino went into the house and shot her mother. Defendant then entered the house where she found her mother lying on the floor, pleading with defendant to help her saying, "[Y]ou've got to help me." Defendant then testified to exiting the house before Tarantino stabbed her mother repeatedly.

Defendant claims Tarantino made her help him clean up and gave her a flashlight and told her to break out a window panel to make it look like a break-in. Defendant testified that she was afraid of Tarantino and said he threatened to "go and get [her] grand-mother" if she did not help him stage the scene, and told her she "was next." Tarantino was the subject of a domestic violence protective order filed by defendant and her mother on 13 May 2004, almost two months before the murder. However, defendant was said to have repeatedly violated the protective order by meeting and communicating with Tarantino and, according to Junior Mundy, defendant asked her mother to lift the protective order because she "still like[d Tarantino]" and wanted to "start back running around with him."

Among the items of evidence recovered at the scene was a crime book entitled *Anatomy of Motive*, which had a place-holding indentation on a section referencing "someone killing their mother" where the suspect in the book used a nine-millimeter pistol. The book was found in defendant's bedroom next to her bed. Several nine-millimeter shell casings and a bullet were recovered at the scene at and around the victim's body.

---

The record on appeal contains eighteen assignments of error. In her brief, however, defendant presented arguments in support of only eight assignments of error. The remaining assignments of error are deemed abandoned. N.C.R. App. P. 28(a) (2008) ("Questions raised by assignments of error in appeals from trial tribunals but not then presented and discussed in a party's brief, are deemed abandoned.").

I.

[1] Defendant first contends the trial court erred by denying her motion to dismiss the charge of solicitation to commit murder at the close of the State's evidence. We agree.

It is "well settled that upon a motion to dismiss in a criminal action, all the evidence admitted, whether competent or incompetent, must be considered by the trial judge in the light most favorable to the State, giving the State the benefit of every reasonable inference that might be drawn therefrom." *State v. Brown*, 310 N.C. 563, 566, 313 S.E.2d 585, 587 (1984). "[T]he trial court should consider if the [S]tate has presented substantial evidence on each element of the crime and substantial evidence that the defendant is the perpetrator." *State v. Fowler*, 353 N.C. 599, 621, 548 S.E.2d 684, 700 (2001) (citing *State v. Israel*, 353 N.C. 211, 216, 539 S.E.2d 633, 636 (2000)), *cert. denied*, 535 U.S. 939, 152 L. Ed. 2d 230 (2002). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brown*, 310 N.C. at 566, 313 S.E.2d at 587 (citing *State v. Smith*, 300 N.C. 71, 78, 265 S.E.2d 164, 169 (1980)). If the evidence "supports that a reasonable inference of defendant's guilt may be drawn from the circumstances, then 'it is for the [jurors] to decide whether the facts, taken singly or in combination, satisfy them beyond a reasonable doubt that the defendant is actually guilty.' " *State v. Warren*, 348 N.C. 80, 102, 499 S.E.2d 431, 443 (alteration in original) (quoting *State v. Rowland*, 263 N.C. 353, 358, 139 S.E.2d 661, 665 (1965)), *cert. denied*, 525 U.S. 915, 142 L. Ed. 2d 216 (1998); *see also Brown*, 310 N.C. at 566, 313 S.E.2d at 587 ("Any contradictions or discrepancies in the evidence are for resolution by the jury." (citing *State v. Witherspoon*, 293 N.C. 321, 237 S.E.2d 822 (1977))). However, "[e]vidence is not substantial if it arouses only a suspicion about the facts to be proved, *even if the suspicion is strong*." *State v. Sumpter*, 318 N.C. 102, 108, 347 S.E.2d 396, 399 (1986) (emphasis added) (citing *State v. Malloy*, 309 N.C. 176, 305 S.E.2d 718 (1983)).

"Solicitation of another to commit a felony is a crime in North Carolina . . . under the common law in this [S]tate." *State v. Furr*, 292 N.C. 711, 720, 235 S.E.2d 193, 199 (citations omitted), *cert. denied*, 434 U.S. 924, 54 L. Ed. 2d 281 (1977). "The gravamen of the offense of soliciting lies in counseling, enticing or inducing another to commit a crime." *Id.*; *see also State v. Mann*, 317 N.C. 164, 171, 345 S.E.2d 365, 369 (1986) ("The solicitor conceives the criminal idea and furthers its commission via another person by suggesting to, inducing, or manipulating that person."). "Solicitation is complete when the request to commit a crime is made, regardless of whether the crime solicited is ever committed or attempted." *State v. Richardson*, 100 N.C. App. 240, 247, 395 S.E.2d 143, 147-48 (citing *State v. Mann*, 317 N.C. 164, 345 S.E.2d 365 (1986)), *disc. review denied*, 327 N.C. 641, 399 S.E.2d 332 (1990).

"[T]o hold a defendant liable for the substantive crime of so-licitation, *the State must prove a request to perform every essential element of the [underlying] crime.*" *State v. Suggs*, 117 N.C. App. 654, 661, 453 S.E.2d 211, 215 (1995) (emphasis added). The underlying felony in the present case is first degree murder. Therefore, to hold defendant liable for solicitation, the State must prove that defendant counseled, enticed, or induced another to commit each of the following: "(1) an unlawful killing; (2) with malice; (3) with the specific intent to kill formed after some measure of premeditation and deliberation." *State v. Peterson*, 361 N.C. 587, 595, 652 S.E.2d 216, 223 (2007).

In the present case, in support of its contention that defend-ant conceived of a plan to have her mother murdered, the State offered into evidence written reports of two interviews with defend-ant on 10 July and 11 July 2004 taken by Detective Dwayne Anders of the Cherokee County Sheriff's Office and Agent Tom Frye of the Multiple Agency Narcotics Unit. The 11 July 2004 Report of Interview stated:

> [Defendant] said she wasn't supposed to be . . . [at home with her mother when Tarantino arrived on the night he killed defend-ant's mother], that was the plan. [Defendant] said she shouldn't have let [Tarantino] in because she knew what was going to hap-pen. . . . [Defendant] said she knew that there was a chance that [Tarantino] was coming that night. . . . [Defendant] said she had remorse about thinking up such a thing and not stopping it. [Defendant] said she could have stopped it.

> [Defendant] said it was supposed to happen Friday. . . . [Defendant] said [Tarantino] asked her what time he could come over and if 1:30 or 2:00 [a.m.] would be ok [sic]. [Defendant] said [Tarantino] said he was going to do it and [defendant] said she . . . told [Tarantino] to do just whatever he wanted to do because she was tired of living like this.

The State further offered evidence, through the testimony of Shane Reid, that defendant had stated "she wanted her mother gone." Reid, who was a friend of both defendant and Tarantino, testi-fied as follows:

A. Up at Sonic. [Defendant] said that she wanted her mother gone.

Q. Do you remember generally approximately when that was?

A. No, sir.

Q. Who was around?

A. I don't recall.

. . . .

Q. Did something happen at school?

A. Yes. [Defendant] said that she wanted her mother gone.

Q. When did that conversation take place?

A. With me and [Tarantino] and a group of my friends before the bell rang.

Q. Do you remember approximately what time of year it was in?

A. Spring time.

Q. Do you remember who was around?

A. No, sir.

Q. Do you remember what exactly she said?

. . . .

A. She said she wanted her mother gone.

The State cites no other evidence to support the charge of solicitation to commit murder, nor does our close review of the five-volume trial transcript reveal any other evidence to support the charge. Thus, at the close of the State's case, the only evidence the State relied upon to argue that defendant solicited Tarantino to kill her mother was the defendant's "plan" to have her mother killed, her agreement with Tarantino about the time that he should arrive at her house to kill her mother, and Reid's testimony that defendant made two statements that she "wanted her mother gone" to one or more of her peers. Although "[a] defendant's conviction of criminal solicitation may properly be based on the defendant's statements and corroborative evidence, including circumstantial evidence showing the defendant's seriousness," 40A Am. Jur. 2d *Homicide* § 586 (1999), in the present case, the State presented no evidence that defendant "counsel[ed], entic[ed,] or induc[ed]" Tarantino to murder defendant's mother. *See Furr*, 292 N.C. at 720, 235 S.E.2d at 199. Therefore, we find that the trial court erred by denying defendant's motion to dismiss the charge of solicitation to commit murder at the close of the State's evidence, and we must reverse defendant's conviction on this charge.

II.

[2] Defendant next contends that the trial court erred by denying her motion to dismiss the charge of conspiracy to commit murder due to insufficient evidence. We disagree.

"Conspiracy . . . is the agreement of two or more persons to do an unlawful act or to do a lawful act by an unlawful means." *Richardson*, 100 N.C. App. at 247, 395 S.E.2d at 148 (citing *State v. Looney*, 294 N.C. 1, 240 S.E.2d 612 (1978)). "The reaching of an agreement is an essential element of conspiracy." *Id.* "Thus, to survive the defendant's motion to dismiss, . . . [the] conspiracy charge[] required that the State produce substantial evidence, which considered in the light most favorable to the State, would allow a jury to find beyond a reasonable doubt that the defendant" and Tarantino agreed to commit the murder of defendant's mother. *See Suggs*, 117 N.C. App. at 661-62, 453 S.E.2d at 216.

However, "[i]n order to prove conspiracy, the State need not prove an express agreement; evidence tending to show a mutual, implied understanding will suffice." *State v. Morgan*, 329 N.C. 654, 658, 406 S.E.2d 833, 835 (1991). "The proof of a conspiracy 'may be, and generally is, established by a number of indefinite acts, each of which, standing alone, might have little weight, but, taken collectively, they point unerringly to the existence of a conspiracy.' " *State v. Lawrence*, 352 N.C. 1, 25, 530 S.E.2d 807, 822 (2000) (quoting *State v. Whiteside*, 204 N.C. 710, 712, 169 S.E. 711, 712 (1933)), *cert. denied*, 531 U.S. 1083, 148 L. Ed. 2d 684 (2001); *see also State v. Benardello*, 164 N.C. App. 708, 711, 596 S.E.2d 358, 360 (2004) ("[I]f the conspiracy is to be proved by inferences drawn from the evidence, such evidence must point unerringly to the existence of a conspiracy.") (internal quotation marks omitted).

In this case, as excerpted above, the State presented evidence of an investigative interview with defendant on 11 July 2004 at the Cherokee County Sheriff's Office in which defendant said that she "wasn't supposed to be . . . [at home with her mother when Tarantino arrived on the night he killed defendant's mother], *that was the plan.*" (Emphasis added.) There was evidence that defendant admitted that she "knew what was going to happen" and said she "*had remorse about thinking up such a thing* and not stopping it." (Emphasis added.) In the interview, defendant further asserted: her mother's murder "was supposed to happen Friday"; she and Tarantino "had talked about [the murder]"; Tarantino "asked her what time he could

come over and if 1:30 or 2:00 [a.m.] would be ok [sic]"; and defend-ant "said [Tarantino] said he was going to do it and [defendant] said she . . . told [Tarantino] to do just whatever he wanted to do because she was tired of living like this."

Additionally, the State presented evidence of three telephone calls made from the telephone at defendant's mother's house—where defendant and her mother were located during the nighttime hours preceding the murder—to the cellular telephone in the possession of Tarantino on that same night. The telephone calls each lasted at least twenty seconds and were made at 4:04 a.m., 4:06 a.m., and 4:14 a.m. At 5:01 a.m., defendant called 911 to report her mother's murder.

While the exact content of the telephone conversations between defendant and Tarantino are not in evidence, the evidence showed that the phone calls were made in rapid succession immediately preceding Mrs. Mundy's death. Defendant contends she telephoned Tarantino to try to stop him from going to her house to carry out the murder. In other words, although defendant "knew what was going to happen" when Tarantino arrived at her mother's house, she argues that she chose to try to reason with Tarantino herself in three early morning phone calls to him while he was en route to her mother's home to commit the murder, rather than call the police for assistance. Further, the State presented evidence that defendant admitted to con-ceiving of and agreeing to a plan with Tarantino to murder her mother on a certain date and at a certain time. Defendant also admitted to agreeing to work with Tarantino to alter the crime scene by cleaning her mother's blood off of the floor with vinegar, and breaking the win-dow panel next to the doorknob to stage the scene like a break-in. While defendant testified that she acted out of fear of Tarantino, tes-timony was presented that defendant ignored the protective order entered against Tarantino and had decided she wanted to "start back running around with [Tarantino]." Because all the evidence admitted must be considered "in the light most favorable to the State, giving the State *the benefit of every reasonable inference* that might be drawn therefrom," *Brown*, 310 N.C. at 566, 313 S.E.2d at 587 (emphasis added), we conclude that the trial court did not err by denying defendant's motion to dismiss the charge of conspiracy to commit murder.

### III.

Defendant finally contends that the trial court erred by sentenc-ing her to consecutive rather than concurrent sentences for conspir-

**IN RE T.R.M.**

[188 N.C. App. 773 (2008)]

acy to commit murder and solicitation to commit murder. Our decision to reverse defendant's conviction on the charge of solicitation to commit murder renders unnecessary our consideration of this assignment of error, and we do not address it.

04 CRS 1715—Solicitation to commit murder—reversed.

04 CRS 2619—Conspiracy—no error.

Judges McGEE and STEPHENS concur.