IN THE COURT OF APPEALS OF NORTH CAROLINA

2022-NCCOA-908

No. COA20-908

Filed 29 December 2022

Randolph County, No. 18 CRS 000051

STATE OF NORTH CAROLINA

v.

JACOB THOMAS NORRIS, Defendant.

Appeal by Defendant from judgment entered 12 March 2020 by Judge William A. Wood II in Randolph County Superior Court. Heard in the Court of Appeals 30 November 2021.

> *Attorney General Joshua H. Stein, by Senior Policy & Strategy Counsel Steven A. Mange, for the State.*

> *Kimberly P. Hoppin for defendant-appellant.*

MURPHY, Judge.

¶ 1      While in high school, Defendant Jacob Thomas Norris admired the Joker, a comic book villain and fictional mass murderer. One day, after confessing via social media to his then-girlfriend, Patty,[1] that he was entertaining homicidal thoughts with respect to a number of his peers, Defendant asked her whether she wanted to kill people as well. Patty, concerned by the conversation, reported what Defendant

---

[1] We use a pseudonym for Defendant's romantic interest throughout this opinion to protect her identity and for ease of reading.

had said to her mom—who, in turn, reported the conversation to law enforcement and school authorities. Defendant was subsequently discovered with a collection of notes and drawings indicating he wanted to harm or kill at least thirteen specific peers.

¶ 2 Defendant was tried for soliciting Patty to commit first-degree murder. At trial, the State's closing arguments included multiple comments about mass shootings. The jury convicted Defendant, who now timely appeals. On appeal, Defendant argues the trial court erred in (A) denying his motion to dismiss for insufficient evidence; (B) denying his motion to dismiss for fatal variance with the indictment; (C) admitting irrelevant evidence under Rules 401 and 402 of our Rules of Evidence; (D) admitting evidence substantially more prejudicial than probative under Rule 403 of our Rules of Evidence; and (E) failing to, ex mero motu, strike the State's grossly improper remarks during closing arguments. For the reasons stated below, we dismiss the case in part; hold in part that the trial court did not err; and, finally, hold in part that, although the trial court erred, it did not commit prejudicial error.

## BACKGROUND

¶ 3 Early in 2018, Defendant Jacob Thomas Norris began dating Patty while both were students at the same high school. During their relationship—most of which

consisted of exchanging messages via Snapchat[2]—Patty learned of Defendant's fascination with the Joker, a murderous comic book villain. Defendant and Patty, who shared a milder interest in the Joker, referred to one another with pet names referencing the Joker and his romantic partner in crime, Harley Quinn, during the brief course of their relationship.

¶ 4     On 29 January 2018, Defendant and Patty exchanged a series of messages in which Defendant expressed having homicidal thoughts and a desire for Patty to join him in acting on them:

> [Defendant:] I have something to say.
>
> [Patty:] Yeah?
>
> [Defendant:] When you say you want to be my Harley, my true Harley, that you don't know what's going to happen when we call ourselves Joker and Harley.
>
> [Patty:] What?
>
> [Defendant:] You said you want to be my true Harley meaning you would have to hurt people.
>
> [Patty:] What are you getting at? Like I'm getting an idea now but not the full picture.

---

[2] At trial, the State asked Patty, "What is Snapchat for us old folks?" For the benefit of the "old folks," Patty explained that "you can either like send pictures and like little messages or you can talk like regular texting on a cell phone and you can video chat or regular voice call on there."

[Defendant:]  You know how Joker and Harley kill people?  That's what I'm getting at.

[Patty:]  Yeah.  Do you want to do something like that?

[Defendant:]  Get it no[w].  Yes.

[Patty:]  Do you want to do that specifically?

[Defendant:]  You don't want that, do you?  If you do, don't -- if you don't, I understand.

[Patty:]  I'm just asking.

[Defendant:]  But do you want that?

. . . .

[Patty:]  I can't quite say I do.  I have a side of me that does.

. . . .

[Defendant:]  So, no.  I told you I'm a sociopath.

. . . .

[Defendant:]  You see me differently now, don't you?

[Patty:]  Since we're asking questions that come deep from our minds, I have one for you and everything is up to you because I respect everything you say and feel.

[Defendant:]  Shoot.

[Patty:]  Do you know what polyamorous is?

[Defendant:]  I'll Google it.  Hold on.

[Patty:]  No, let me tell you.

[Defendant:]  Shoot.

[Patty:]  But do you have any idea what it is?

[Defendant:]  No, never heard of it.

[Patty:]  Do you know what monogamous is?

[Defendant:]  Never heard of it.

[Patty:]  Okay.

[Defendant:]  So going to tell me?

[Patty:]  Monogamous is when two people date/marry, and it's only two people.  Polyamorous is when there are more than two people date one another.

[Defendant:]  What are you trying to say?

[Patty:]  Just hear me out.  Okay?  Don't just assume anything because it most likely will not be true.

[Defendant:]  Okay.

[Patty:]  So I feel as I am polyamorous myself because I've always liked more than one person.  Not right now though.  It's just strictly you, I promise.  But I truly do feel as though I am this way.  I have a video of information on polyamorous if you're interested in hearing more about it so you understand it better, but I wanted to run this by you because I want your opinion and thoughts and I thought now is the perfect time to ask you since we are both asking things that only both of us would understand each other in more ways and, no, I do not see you differently.  It just caught me off guard.

[Defendant:]  So do you or do you not want to be my Harley?

[Patty:]   I am your Harley.   Just you understand your Harley.

[Defendant:] I understand.

[Patty:]  Or accept this part of her.

[Defendant:]  Is this the gentle part?

[Patty:]  Of what I'm saying?

[Defendant:]  Yes.

[Patty:]  How much do you accept?

[Defendant:]  The whole package.

. . . .

[Patty:] Thank you.  Thank you for dealing with me, seeing me as how I am accepting me for who I am as a person.  I know I already ask so much of you and you have no idea how thankful I am that you are here in my life and love me for who I am.  I don't think any words could ever tell me enough of what you are and mean to me.  I don't know what I did to get you in my life but whatever it was I would do it again over and over and over.  No matter how many times I would constantly do it so you came into my life.  I have a feeling you're going to be my one.  I can just feel it.  Now I'll gladly be your Harley Quinn till the day I die.[3]

---

[3] For formatting purposes, the dialogue reproduced in the text of the opinion above is the conversation between Defendant and Patty as read aloud by Patty for the jury at trial. As minor alterations exist between the transcribed version of the conversation above and the conversation as presented in the exhibits, we turn the attention of any reader wishing to examine the original Snapchat conversation to Record Supplement pages 1 through 11.

After the exchange, Patty, concerned about what Defendant had expressed, showed the messages to her mother, who reported the conversation to law enforcement. The day after the conversation, Patty and her mother also reported the exchange to the school resource officer ("SRO"), the principal, and the guidance counselor.

¶ 5        On 31 January 2018, the principal and SRO met with Defendant, who admitted to sending the messages, told them he was a sociopath, and expressed that he found death funny. At the time of the meeting, the SRO did not believe Defendant had committed any crime. However, the same day, the SRO visited Defendant's home, where there were multiple guns and knives; and, on a second visit one month later, Defendant's father provided the SRO a collection of notes documenting Defendant's violent ideations concerning his peers. Among these notes were two papers entitled "Test Subjects" and "Kill List"—which, as their titles imply, named individuals Defendant appeared to have marked for human experimentation and homicide, respectively. The list entitled "Test Subjects" included the cities where the individuals lived, and the "Kill List" included a method of, and reason for, killing each of the thirteen individuals it named. There was also a document called "Joker Toxin" that identified the prices of various poisons.

¶ 6        Upon the school official's discovery of Defendant's notes, Defendant was suspended and, later, indicted for solicitation to commit murder. The indictment read as follows:

> The jurors for the State upon their oath present that on or about the date(s) of offense shown and in the county named above [] [D]efendant unlawfully, willfully and feloniously did solicit [Patty] to commit the felony of Murder, [N.C.G.S. §] 14-17, of persons known to the defendant, to wit: [first and last initials used for each individual]. [] [D]efendant intending [sic] to murder persons named in a list he created and in his possession and entitled "Kill List."

¶ 7        At trial, the State presented evidence of the above. In addition to testimony from Patty, the principal, and the SRO, among others, the State offered—and the trial court admitted, over Defendant's objections—testimony from eleven of the thirteen people whose names appeared on the "Kill List," as well as the mother of a twelfth person appearing on the list and a collection of notes and drawings by Defendant concerning the Joker. During closing arguments, the State remarked that Patty was "terrified[] [b]ecause [her] significant other was asking [her] to go kill people . . . ." It also remarked that Defendant "had the means to carry out [his] threats" and that there was "a diagram of [the] school."[4] Finally, the State also suggested there was a link between the allegations against Defendant and "current events," presumably in reference to the frequent, high-profile mass shootings taking place in the years immediately preceding Defendant's trial:

> Now, I'm not going to talk about current events and what's going on everywhere, but you are not required to empty

---

[4] The "diagram of [the] school" refers to one of Defendant's drawings, which the principal testified resembled a map of Defendant's high school.

> your brains of everything you know about these situations.
> . . .
>
> . . . . When you all go back there you can educate yourselves
> and talk about the Joker. An emblem of evil. The most
> twisted character there is. Mass murderer. Crime sprees.
> Hurting other people. That's the evil that this man . . .
> embraced. And once you do that, as completely as he did,
> there's no stepping back. There's no stepping back.

¶ 8 After closing arguments, the jury found Defendant guilty of solicitation to commit first-degree murder on 12 March 2020, and the trial court gave him an active sentence of 58 to 82 months. Defendant timely appealed.

## ANALYSIS

¶ 9 On appeal, Defendant argues the trial court erred in (A) denying his motion to dismiss for insufficient evidence; (B) denying his motion to dismiss for fatal variance with the indictment; (C) admitting irrelevant evidence under Rules 401 and 402 of our Rules of Evidence; (D) admitting evidence substantially more prejudicial than probative under Rule 403 of our Rules of Evidence; and (E) failing to, ex mero motu, strike the State's grossly improper remarks during closing arguments.

### A. Motion to Dismiss: Insufficient Evidence

¶ 10 Defendant first argues the trial court erred in denying his motion to dismiss for insufficient evidence.

> We review denial of a motion to dismiss criminal
> charges *de novo,* to determine whether there is substantial
> evidence (1) of each essential element of the offense

charged, or of a lesser offense included therein, and (2) of [the] defendant's being the perpetrator of such offense. The trial court must analyze the evidence in the light most favorable to the State and give the State the benefit of every reasonable inference from the evidence. The trial court does not weigh the evidence, consider evidence unfavorable to the State, or determine any witness' credibility.

*State v. Spruill*, 237 N.C. App. 383, 385 (2014) (citations omitted), *disc. rev. denied*, 368 N.C. 258 (2015). Here, there is no contention that there was insufficient evidence of Defendant's identity; accordingly, we review de novo whether the State presented sufficient evidence of each element of the alleged crime.

¶ 11        Concerning the offense of solicitation, we have remarked that

[t]he gravamen of the offense of soliciting lies in counseling, enticing or inducing another to commit a crime. Solicitation is complete when the request to commit a crime is made, regardless of whether the crime solicited is ever committed or attempted.

To hold a defendant liable for the substantive crime of solicitation, *the State must prove a request to perform every essential element of the underlying crime.*

*State v. Crowe*, 188 N.C. App. 765, 768-69 (citations omitted), *cert. denied, disc. rev. denied*, 362 N.C. 364 (2008). Thus, where the underlying offense is first-degree murder, "the State must prove that [the] defendant counseled, enticed, or induced another to commit . . . '(1) an unlawful killing; (2) with malice; (3) with the specific intent to kill formed after some measure of premeditation and deliberation.'" *Id.* at

769 (quoting *State v. Peterson,* 361 N.C. 587, 595 (2007), *cert. denied,* 552 U.S. 1271, 170 L. Ed. 2d 377 (2008)).

¶ 12        Defendant offers two primary contentions with respect to sufficiency of the evidence: first, that the evidence does not support Defendant having *solicited*—that is, "counseled, enticed, or induced," *id.*—Patty to commit a crime; and, second, that Defendant could not have solicited Patty to commit *first-degree murder* because Patty was not aware of the specific people on Defendant's "Kill List."

¶ 13        As to Defendant's first contention, our Supreme Court has stated that solicitation is "an attempt to conspire" so that "the solicitor plans, schemes, suggests, encourages, and incites the solicitation." *State v. Mann,* 317 N.C. 164, 171-72 (1986); *see State v. Smith,* 269 N.C. App. 100, 101 (2019) (quoting 2 Wayne R. Lafave, *Substantive Criminal Law* § 11.1, at 264 (3d ed. 2018) ("For the crime of solicitation to be completed, it is only necessary that the actor, with intent that another person commit a crime, have enticed, advised, incited, ordered or otherwise encouraged that person to commit a crime.")). Such is the case here. Defendant reiterated that he intended to kill at least three times as Patty sought clarification during their Snapchat conversation: first, he hinted at what was "going to happen when [they] call[ed] [them]selves Joker and Harley"; second, when Patty expressed confusion, he elaborated that "[his] true Harley . . . would have to hurt people"; and, finally, he outright stated that "Joker and Harley kill people[.]" Moreover, Defendant's

communication fits comfortably within applicable definitions of "entice": "[t]o lure or induce[.]" *Entice*, Black's Law Dictionary (9th ed. 2009); *see also Crowe*, 188 N.C. App. at 769 (emphasis added) ("[T]he State must prove that [the] defendant counseled, *enticed*, or induced another to commit [the underlying crime].").

¶ 14         The second contention fails as well. "Solicitation is a specific-intent crime, and the offense is complete upon the request." *State v. Smith*, 269 N.C. App. 100, 101 (2019) (citations omitted). For the State to demonstrate the underlying mens rea in a solicitation case, it is not necessary for it to show the solicitor fully communicated the details of his or her plan to the listener; rather, "[t]he *solicitor conceives the criminal idea* and furthers its commission via another person by suggesting to, inducing, or manipulating that person." *Mann*, 317 N.C. at 171 (emphasis added). As we noted in *Mann*, "'the solicitor, working his will through one or more agents, manifests an approach to crime more intelligent and masterful than the efforts of his hireling'" such that "the solicitor is morally more culpable than a conspirator; he keeps himself from being at risk, hiding behind the actor" he solicited. *Id.* at 172 (quoting Wechsler, Jones, and Korn, *The Treatment of Inchoate Crimes in the Model Penal Code of the American Law Institute: Attempt, Solicitation and Conspiracy*, 61 Colum. L. Rev. 571, 621-22 (1961)); *see also* Joshua Dressler, *Cases and Materials on Criminal Law* 798 (3rd ed. 2003) (emphasis added) ("Solicitation is a controversial crime because *the offense is complete as soon as the solicitor asks, entices, or*

*encourages* another to commit the target offense. As observed in *Mann*, a solicitation may consist of nothing more than an attempt to conspire with another to commit an offense, which essentially makes solicitation a double inchoate offense.").

Here, as long as Defendant's "Kill List" tended to demonstrate to the jury that the killings he proposed to Patty were, as they existed in his *own* mind, unlawful, malicious, and specifically intended after a measure of premeditation and deliberation, the evidence was sufficient to survive a motion to dismiss. And, in this case, the "Kill List" evidenced each of these elements. Indeed, Defendant's conveyance of his desire to kill others fits the general malice requirement, and his having asked Patty to kill necessarily contemplates the killings he asked her to perform being premeditated and deliberated.[5] *See State v. McBride*, 109 N.C. App.

---

[5] This is, of course, to say nothing of what was, in the light most favorable to the State, the meticulous planning of killings and other acts of violence reflected in Defendant's notes and drawings presented at trial—which included, but were not limited to, a recipe for a toxin with which to "poison [the] water supply" and concept art of a Joker-themed combat suit.

However, we separately note our wariness of the use of what may otherwise be considered Defendant's artistic expression or self-care journaling for this purpose. While creating new laws governing the permissibility of certain categories of evidence is a task for the political branches of our government, we note for the General Assembly's consideration that other states have limited or considered limiting the use of defendants' creative expression as evidence in cases where the literal truth of the expression is dubious. *See, e.g.*, An Act to Add Section 352.2 to the Evidence Code, Relating to Evidence (effective Jan. 1, 2023) (to be codified at 2022 Cal. Stat. 973) ("In any criminal proceeding where a party seeks to admit as evidence a form of creative expression, the court, while balancing the probative value of that evidence against the substantial danger of undue prejudice[,] . . . shall consider[] that[] . . . the probative value of such expression for its literal truth or as a truthful narrative is minimal unless that expression is created near in time to the charged crime or crimes,

64, 68 (1993) (marks omitted) (citing *State v. Reynolds*, 307 N.C. 184, 191 (1982)) ("There is[] . . . a [] kind of malice which is defined as nothing more than that condition of mind which prompts a person to take the life of another intentionally without just cause, excuse, or justification."). Defendant's motion to dismiss for insufficient evidence was properly denied.

## B. Motion to Dismiss: Fatal Variance

Next, Defendant argues that the trial court erred in denying his motion to dismiss because the indictment fatally varied from the jury instruction at trial. The indictment alleged that Defendant "solicit[ed] [Patty] to commit the felony of Murder, [N.C.G.S. §] 14-17, of persons known to [] [D]efendant, to wit: C.P., C.D., M.C., C.C., C.E., C.E., A.H., N.B., D.B., H.D., L.G., D.B., C.S." The jury, meanwhile, was instructed the State had to prove "Defendant solicited, that is urged or tried to persuade another . . . to murder another person" and that "Defendant intended that the person he solicited murder the alleged victim." Defendant contends the variance between the indictment and the instruction warrant reversal on appeal.

However, Defendant's argument appears to be little more than an allegation of instructional error clothed as fatal variance. Fatal variance occurs when a

---

bears a sufficient level of similarity to the charged crime or crimes, or includes factual detail not otherwise publicly available."); *see also* S.B. S7527, 244th Leg. Session (N.Y. 2022) (awaiting vote by N.Y. State Assembly).

discrepancy existed between the language in the indictment and the evidence at trial. *See State v. Glenn*, 221 N.C. App. 143, 147 (2012) ("A variance between the criminal offense charged and the offense established by the evidence is in essence a failure of the State to establish the offense charged."); *State v. Watson,* 272 N.C. 526, 527 (1968) (quoting *State v. Jackson,* 218 N.C. 373, 376 (1940)) ("'It is a rule of universal observance in the administration of criminal law that a defendant must be convicted, if convicted at all, of the particular offense charged in the bill of indictment. The allegation and proof must correspond.'"). While occasional analyses in our caselaw have discussed jury instructions in relation to fatal variance, none have fully untethered a fatal variance analysis from discussion of the evidence itself in the way Defendant attempts to do here. *See, e.g.*, *State v. Turner*, 98 N.C. App. 442, 448 (1990) ("[W]e believe that the State's evidence does support the trial court's instruction; however, the indictment does not."); *State v. Charleston*, 248 N.C. App. 671, 678 (2016) (marks omitted) ("Generally, an impermissible variance has occurred when, although the State's evidence might support the trial court's instruction, the indictment does not.").

¶ 18    Our caselaw contains a mechanism for contesting the accuracy of jury instructions; that mechanism is alleging instructional error. *Carrington v. Emory*, 179 N.C. App. 827, 829 (2006) ("A trial court must instruct the jury on the law with regard to every substantial feature of a particular case."). And, where a defendant

alleges on appeal that instructional error occurred after having not objected at trial, he must specifically allege plain error to invoke our review. N.C. R. App. P. 10(a)(4) (2022) (emphasis added) ("In criminal cases, an issue that was not preserved by objection noted at trial and that is not deemed preserved by rule or law without any such action nevertheless may be made the basis of an issue presented on appeal when the judicial action questioned is *specifically and distinctly* contended to amount to plain error."); *State v. Collington*, 375 N.C. 401, 411 (2020) (marks omitted) ("The purpose of Rule 10(a)(4) is to encourage the parties to inform the trial court of errors in its instructions so that it can correct the instructions and cure any potential errors before the jury deliberates on the case and thereby eliminate the need for a new trial. Indeed, even when the plain error rule is applied, it is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court."). Defendant did not seek our review for plain error, and we will not entertain an improperly appealed instructional error argument simply because it arrived within the Trojan horse of a fatal variance heading in Defendant's brief. We dismiss this challenge.

### C. Rules 401 and 402

¶ 19   Defendant next argues the trial court erred in admitting evidence that was irrelevant under Rules 401 and 402 of our Rules of Evidence. He bases this argument on the admission of two groups of evidence: (1) a collection of drawings and notes

depicting the Joker and a variety of weapons, and (2) testimony from eleven of the thirteen people on the "Kill List" and a relative of the twelfth. "Whether evidence is relevant is a question of law, thus we review the trial court's admission of the evidence *de novo*." *State v. Kirby*, 206 N.C. App. 446, 456 (2010).

¶ 20    "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C.G.S. § 8C-1, Rule 401 (2021). "The value of the evidence need only be slight." *State v. Roper*, 328 N.C. 337, 355, *cert. denied*, 502 U.S. 902, 116 L. Ed. 2d. 232 (1991). Moreover, "[i]n order to be relevant, evidence need not bear directly on the question in issue if it is helpful to understand the conduct of the parties, their motives, or if it reasonably allows the jury to draw an inference as to a disputed fact." *State v. Miller*, 197 N.C. App. 78, 86, *disc. rev. denied*, 363 N.C. 586 (2009).

¶ 21    Here, both groups of evidence—the drawings and the testimony—are relevant. The drawings would help the jury determine Defendant's state of mind and evaluate whether the proposed crime, as he imagined it, met the requirements for solicitation. *See supra* at ¶ 14. This is especially pertinent in a case where, as here, a jury may have understood Defendant's proposition as a joke or otherwise been skeptical about his sincerity without a fuller glimpse into his state of mind at the time of his discussion with Patty. Furthermore, the testimony was relevant to show that the

people described on Defendant's "Kill List" were real and to further demonstrate that he had the requisite specific intent to have solicited Patty to commit first-degree murder. As a result, the admission of the two groups of evidence was proper.

**D. Rule 403**

¶ 22 Defendant further argues the drawings and testimony discussed with respect to Rules 401 and 402, if relevant, had "probative value [that was] substantially outweighed by the danger of unfair prejudice" under Rule 403. *See* N.C.G.S. § 8C-1, Rule 403 (2021) ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."). "A trial judge's decision under Rule 403 regarding the relative balance of probative weight and potential for prejudice will only be overturned for an abuse of discretion." *State v. Hyman,* 153 N.C. App. 396, 401-02 (2002), *cert. denied,* 357 N.C. 253 (2003). "[W]here the trial court is given discretion to make a decision and exercises that discretion, we may only reverse that decision if the appellant shows that the decision was not the result of a reasoned choice." *State v. Jordan*, 128 N.C. App. 469, 475, *disc. rev. denied*, 348 N.C. 287 (1998).

¶ 23 At the threshold, we note that both groups of evidence—Defendant's Joker-related notes and drawings and the testimony of the individuals on the "Kill List"—

created an undeniable risk of prejudice to Defendant. We have little doubt that exposure to detailed records of Defendant's violent thoughts, especially when paired with live testimony from the young men and women those thoughts concerned, would have stirred the emotions of the jurors in this case. Nonetheless, the existence of *some* prejudice will not warrant exclusion under Rule 403; rather, "[r]elevant evidence is admissible, despite its prejudicial effect, unless the evidence is *unfairly* prejudicial." *State v. Moseley*, 338 N.C. 1, 33 (1994) (emphasis added), *cert. denied*, 514 U.S. 1091, 131 L. Ed. 2d 738 (1995). Our Supreme Court, for example, has held that a trial court erred under Rule 403, not when evidence would inflame the jury in the general sense, but instead when its probative value is so comparatively negligible that it would "tend *solely* to inflame the jurors." *State v. Hennis*, 323 N.C. 279, 284 (1988) (emphasis added).

¶ 24        Moreover, whether evidence was unfairly prejudicial is a circumstantial judgment that depends on the context of its presentation. Of photographic evidence, for example, our Supreme Court has said the following:

> The test for excess is not formulaic: there is no bright line indicating at what point the number of crime scene or autopsy photographs becomes too great. The trial court's task is rather to examine both the content and the manner in which photographic evidence is used and to scrutinize the totality of circumstances composing that presentation. What a photograph depicts, its level of detail and scale, whether it is color or black and white, a slide or a print, where and how it is projected or presented, the scope and

clarity of the testimony it accompanies—these are all
factors the trial court must examine in determining the
illustrative value of photographic evidence and in weighing
its use by the [S]tate against its tendency to prejudice the
jury.

*Id.* at 285.

¶ 25        Here, although the State only actually used the two groups of evidence

cursorily—each segment of testimony involving a person on the "Kill List" lasted less

than four transcript pages, many far less—the *danger* of unfair prejudice resulting

from the State's indication it was going to introduce the notes and drawings and have

almost all of the individuals named on the "Kill List" testify was, at the times

Defendant objected, substantial. However, because the trial court chose to admit both

groups of evidence on reasonable bases offered by the State—including the drawings'

tendency to illustrate Defendant's mental state, the witness's tendency to

demonstrate that the "Kill List's" stated victims were real people, and the State's

assurance that the interviews would be "really quick"—we cannot say the trial court's

admission of the evidence rose to the level of an abuse of discretion. While we find it

likely that the jury's passions were stirred by the drawings and testimony, the

evidence served a probative function arguably above and beyond inflaming them.

### E. Failure to Intervene

¶ 26        Finally, Defendant argues the trial court erred in failing to intervene ex mero

motu during three sections of the State's closing argument: (1) when the State

characterized the evidence presented in a manner that conformed to its narrative at

trial; (2) when the State remarked that Patty did not need to know of the "Kill List"

for Defendant to be found guilty of solicitation to commit murder; (3) when the State

allegedly demeaned Defendant's character by insinuating that his flat affect

indicated a lack of remorse; and (4) when the State allegedly appealed to the jury's

sympathies discussing the evil nature of the Joker and alluding to the national

prevalence of mass shootings.

¶ 27        "The standard of review for assessing alleged improper closing arguments that

fail to provoke timely objection from opposing counsel is whether the remarks were

so grossly improper that the trial court committed reversible error by failing to

intervene *ex mero motu*." *State v. Jones*, 355 N.C. 117 (2002).

> [W]hen defense counsel fails to object to the prosecutor's
> improper argument and the trial court fails to intervene,
> the standard of review requires a two-step analytical
> inquiry: (1) whether the argument was improper; and, if so,
> (2) whether the argument was so grossly improper as to
> impede the defendant's right to a fair trial.

*State v. Huey*, 370 N.C. 174, 179 (2017). While "we have long recognized that

prosecutors are given wide latitude in the scope of their argument and may argue to

the jury the law, the facts in evidence, and all reasonable inferences drawn

therefrom[,]" *id.* at 180 (marks omitted), it remains the case that "an attorney may

not become abusive, inject his personal experiences, express his personal belief as to

the truth or falsity of the evidence or as to the guilt or innocence of the defendant, or make arguments on the basis of matters outside the record" during closing arguments. N.C.G.S. § 15A-1230(a) (2021).

¶ 28 Furthermore, a defendant appealing based on the trial court's failure to intervene ex mero motu "has the burden to show a reasonable possibility that, had the errors in question not been committed, a different result would have been reached at the trial." *State v. Goins*, 377 N.C. 475, 2021-NCSC-65, ¶ 11 (marks omitted). "When evaluating the prejudicial effect of an improper closing argument, we examine the statements in context and in light of the overall factual circumstances to which they refer." *Id.* at ¶ 13 (marks omitted). In so doing, "we look to the evidence presented at trial and compare it with what the jury actually found[,]" as "[i]ncongruity between the two can indicate prejudice in the conviction." *Huey*, 370 N.C. at 185; *see also Goins*, 2021-NC-65 at ¶ 16 (basing a finding that improper statements did not prejudice the defendant, in part, on the jury's re-examination of a piece of evidence during deliberations).

### 1. Characterization of the Evidence

¶ 29 Defendant argues the State improperly characterized the evidence by indicating that Patty was terrified that Defendant was urging her to kill people, that Defendant had the means to carry out an attack on the targets identified on his "Kill List," that Defendant's father knew about the list and did not take appropriate action,

and that one of the people named on the list had specifically called Defendant a "chicken." None of these were "so grossly improper as to impede [] [D]efendant's right to a fair trial." *Huey*, 370 N.C. at 179.

¶ 30    As mentioned previously, the elements of solicitation to commit first-degree murder are that Defendant counseled, enticed, or induced another to commit an unlawful killing with malice and the specific intent to kill formed after some measure of premeditation and deliberation. *See supra* at ¶ 11. Assuming, as we must, that the jury correctly applied the instructions provided to it with respect to the charge at issue, neither the father's purported inaction nor whether the Defendant had specifically been called "chicken" would have had any logical relationship to the elements of the offense. *See State v. Prevatte*, 356 N.C. 178, 254 (2002) ("Jurors are presumed to follow a trial court's instructions."), *cert. denied*, 538 U.S. 936, 155 L. Ed. 2d 631 (2003). These comments, therefore, did not impede Defendant's right to a fair trial—let alone prejudice him.

¶ 31    Defendant's ability to act on his "Kill List" and Patty's response bear a clearer relationship to the elements of the offense, as they tend to lend credibility to the State's contention that Defendant had the requisite intent. However, in both of these cases, the characterizations were, at worst, unfavorable interpretations of the evidence presented at trial. With respect to the actionability of the "Kill List," Defendant argues that he could not have taken action because "[Defendant's] father

secured or removed all weapons [from his home] when asked to do so." However, the State's argument most plausibly refers to the actionability of the "Kill List" at the time of the solicitation, *after* which the weapons in the home were removed. Furthermore, with respect to the object of Patty's fear, Patty described herself as "terrified" and expressed that she "wanted out of it, too, and [] wanted to go and talk to someone as soon as possible." While perhaps uncharitable to Defendant, this statement could fairly be interpreted as Patty being frightened by Defendant seeking her participation in his plans.

**2. Summation of the Law**

Defendant also argues the trial court erred by failing to intervene when the State remarked that Patty did not need to know of the "Kill List" for Defendant to be found guilty of solicitation to commit murder. However, for the reasons discussed in Part A of our analysis, *see supra* at ¶ 14, this is a correct statement of the law of solicitation, and the trial court did not err.

**3. Demeaning Defendant's Character**

Defendant next argues the trial court erred by failing to intervene when the State demeaned his character by suggesting he lacked remorse. However, the only point in the transcript to which Defendant directs our attention for this proposition is a single instance in which the State described Defendant as "[v]ery matter-of-fact." Even assuming such a mundane turn of phrase qualifies as demeaning Defendant,

this characterization was supported—almost verbatim—by testimony presented at trial. In this regard, then, the trial court also did not err.

**4. Statements on the Joker and Mass Shootings**

The last occasion on which Defendant argues the trial court erred by failing to intervene ex mero motu is when the State appealed to the jury's sympathies by describing the nature of the Joker and insinuating that Defendant was planning a mass shooting:

> Now, I'm not going to talk about current events and what's going on everywhere, but you are not required to empty your brains of everything you know about these situations.
> . . .
>
> . . . . When you all go back there you can educate yourselves and talk about the Joker. An emblem of evil. The most twisted character there is. Mass murderer. Crime sprees. Hurting other people. That's the evil that this man . . . embraced. And once you do that, as completely as he did, there's no stepping back. There's no stepping back.

In addition to the specific occasion above, Defendant also points out three other occasions during closing arguments when the State referenced mass shootings:

> [Patty and her mother went] to the police department because they [knew] something bad may occur. They want[ed] to prevent a mass shooting.
>
> . . . .
>
> If I call you and say hey, let's go kill some people -- because that's exactly what he's saying here, let's go kill some of these people. I call you and I mean it, and I have that

> malice in my heart because I felt like people had bullied
> me. Isn't that how mass shootings start?
>
> . . . .
>
> Well, shootings at school, that never happens. [The
> principal] doesn't need to be worried about that. That
> never happens in the United States. No reason for him to
> be concerned about that.
>
> . . . .
>
> [Patty] didn't know who they were going to be. That's how
> mass shootings operate. You may not know who all the
> victims are. The important thing is he solicited to murder.

¶ 35        Our Supreme Court has found the State's improper remarks to be reversible error under similar circumstances. In *State v. Jones*, for example, the North Carolina Supreme Court held that the trial court abused its discretion "when it overruled [the] defendant's timely objection to the prosecutor's references to the Columbine school shooting and the Oklahoma City bombing[,]" two high-profile mass killings. *Jones*, 355 N.C. at 131, 133. The Court reasoned that

> [t]he impact of the statements in question, which conjure
> up images of disaster and tragedy of epic proportion, is too
> grave to be easily removed from the jury's consciousness,
> even if the trial court had attempted to do so with
> instructions. Moreover, the offensive nature of the
> remarks exceeds that of other language that has been tied
> to prejudicial error in the past.

*Id.* at 132. Based on this reasoning, we are persuaded that, at least to some degree, the remarks were improper, as they were clearly designed to instill in the jury the

idea that Defendant's conviction would prevent another in a string of nationally salient acts of mass violence.

¶ 36        However, unlike in *Jones*, where the issue was whether the trial court abused its discretion in overruling the defendant's objection to the State's improper comments at trial, *id.* at 137, Defendant's contention is that the trial court failed to intervene ex mero motu. The basic impropriety of the State's comment, then, is only the first prong of the analysis, to be followed by a determination of "whether the argument was so grossly improper as to impede the defendant's right to a fair trial." *Huey*, 370 N.C. at 179. As to this second prong, we remain unconvinced. If the jury accepted that Defendant sincerely intended to kill the thirteen people named on his "Kill List"—which the verdict indicates was the case—whether that intent would have been acted upon in the form of a typical mass shooting or some other act of violence would have been immaterial to the elements of the crime; the question posed was whether Defendant solicited Patty to commit first-degree murder in some form, not whether he solicited her to commit first-degree murder via mass shooting in particular. In other words, the State's invocation of high-profile mass shootings would have painted in the juror's minds only one of many scenarios which could just as legitimately have supported the verdict.

¶ 37        Furthermore, we disagree with Defendant's contention that he was prejudiced by the remarks. In attempting to establish prejudice, Defendant correctly points out

that "the State raised the . . . specter of mass shootings and school shootings where these were not even discussed . . . and were not relevant to the narrow questions to be decided by the jury." However, this alone does not establish prejudice, especially when "we examine the statements in context and in light of the overall factual circumstances to which they refer." *Goins*, 2021-NCSC-65 at ¶ 13 (marks omitted). The comments, while improper, took place during a closing argument consistently grounded in the concrete, factual details discussed at trial, not an emotional appeal to the jury. Furthermore, there were multiple items of physical evidence and segments of testimony evidencing Defendant's intent, and the act of solicitation itself was established by a written record of messages. Against such great evidentiary weight, we remain unconvinced that the State's improper comment prejudiced Defendant.

¶ 38    As such, even though these comments were improper, the trial court's failure to intervene does not constitute reversible error.

## **CONCLUSION**

¶ 39    The evidence at trial was sufficient to convict Defendant of solicitation to commit first-degree murder, notwithstanding Defendant's contentions that his actions did not qualify as solicitation and the fact that Patty was unaware of specific targets. Defendant's nominal fatal variance argument was, in substance, an unpreserved allegation of instructional error at trial, and he failed to specifically seek

our review for plain error, thus abandoning the argument.  Furthermore, all evidence contested on appeal was both relevant and not substantially more prejudicial than probative.  Finally, the State's remarks during closing arguments, despite being improper, were neither prejudicial nor so grossly improper that they denied Defendant his right to a fair trial.

NO ERROR IN PART; DISMISSED IN PART; NO PREJUDICIAL ERROR IN PART.

Judges DIETZ and WOOD concur.